1
2
3
4
5
6
7
8                  UNITED STATES DISTRICT COURT

9               SOUTHERN DISTRICT OF CALIFORNIA

10   MICHAEL AGUON,                    Case No.: 16-cv-2421-BAS-AGS

11                         Petitioner,  **ORDER DENYING WRIT OF**
                                        **HABEAS CORPUS**
12   v.

13   WARREN L. MONTGOMERY, Warden,

14                         Respondent.

15

16          Petitioner Michael Aguon is currently spending fifty years to life in state prison for

17   murder.  He challenges that state conviction by way of a petition for a writ of habeas corpus.

18   In his petition, he argues the State made various missteps in offering evidence that he was

19   a gang member, made inappropriate comments in closing arguments, and that his counsel

20   failed to adequately represent him.  For the reasons stated below, the Court **DENIES** the

21   petition.[1]

22   **I.    BACKGROUND**

23          The California Court of Appeal's opinion in Petitioner's direct appeal has a

24   thorough, unchallenged recitation of the facts in Petitioner's case, which the Court adopts

25

26   _____

27   [1] Although this case was randomly referred to United States Magistrate Judge Andrew G. Schopler
     pursuant to 28 U.S.C. § 636(b)(1)(B), the Court has determined that neither a Report and Recommendation
28   nor oral argument are necessary for the disposition of this matter.  *See* Civ. L. R. 72.1(d).

                                          1

by reference but which does not warrant setting out in full. (*See generally* ECF No. 1, at 19–26.) On October 21, 2007, Rafael "Grims" Meraz of the Lomita Village 70s ("Lomitas") gang drunkenly threatened Vidal "Junior" Balderas and his friends and family because he mistakenly believed they belonged to a rival gang. Balderas and his friend, Carranza, proceeded to disarm and beat Meraz. (*Id.* at 20–21.) Ten days later, on Halloween, three masked assailants ambushed and gunned down Balderas outside his home. The State believed Meraz and Petitioner were both Lomitas and worked together to kill Balderas in retaliation for the earlier encounter with Meraz. Thus, the State charged Meraz and Petitioner as codefendants in Balderas's murder.

Both witness testimony and physical evidence discovered at Meraz's house linked him to the murder. (*See id.* at 21–22.) A government informant, Elizabeth Hiday, provided the bulk of the facts linking Petitioner to the shooting. (*See id.* at 22–24.) Three days after the shooting, Hiday was at Petitioner's house when Petitioner recounted a detailed story explaining how he and two other Lomitas murdered Balderas. (*Id.*) The details of Hiday's story were corroborated by eyewitnesses, such as the fact that one of the attackers wore a mask from the movie "Scream."

As part of its case, and to support a gang-related sentencing enhancement, the prosecution argued that the murder was motivated by Petitioner's membership in and devotion to the Lomitas gang. To support this theory, the State offered testimony from several police officers who had encountered Petitioner in Lomitas territory with known Lomitas gang members. (*See generally* ECF No. 27-27, at 110–64.) The prosecution also offered testimony from detective Damon Sherman, a street gang expert who opined that Petitioner was a member of the Lomitas based on these encounters and various pieces of physical evidence located in Petitioner's home and on his camera. (*See id.* at 165–95, 204–47; ECF No. 27-28, at 29–128.) In addition, Hiday, who was previously a Lomitas gang member, testified that Petitioner was a Lomitas member. (*See* ECF No. 27-28, at 154.) Finally, Larry Vargas—a member of a different gang who grew up with Petitioner—testified for the prosecution that Petitioner was a Lomitas member. (*See* ECF

2

No. 27-27, at 197–98.)  On November 6, 2013, the jury convicted Petitioner of first-degree murder with a firearm and he was later sentenced to fifty years to life in California state prison.  (ECF No. 1, at 18.)

Petitioner appealed the guilty conviction to the California Court of Appeal arguing there was a jury-verdict form error and prosecutorial misconduct.  (*Id.*)  The Court of Appeal rejected the arguments, but ordered a limited remand to correct a clerical error in the abstract of judgment.  (*Id.* at 19.) Petitioner then sought review of his prosecutorial misconduct claim in the California Supreme Court.  The California Supreme Court denied review.  Thereafter, Petitioner filed a petition for a writ of habeas corpus to the California Supreme Court raising violations of the Confrontation Clause, claims of ineffective assistance of counsel, and violations of *Miranda v. Arizona*, 384 U.S. 436 (1966).  (*See* ECF No. 11-4, at 1–22.)  The California Supreme Court denied the petition without opinion.  (*See* ECF No. 11-5, at 1.)

In the instant petition to this Court, Petitioner seeks a writ of habeas corpus based on: (1) violations of the Confrontation Clause, (2) violations of *Miranda*, (3) ineffective assistance of counsel, and (4) prosecutorial misconduct.  (*See generally* ECF No. 1, at 1–14.)[2]

## II.  LEGAL STANDARD

This Court may not disturb a state court conviction unless it was the result of "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  "A state court's decision can involve an 'unreasonable application' of Federal law if it either 1) correctly identifies the governing rule but then applies it to a

_____

[2] Petitioner attached his California Supreme Court petition for habeas corpus relief to his petition to this Court, wherein he raised all of the same arguments except the prosecutorial misconduct claim.  (*See* ECF No. 1, at 58–78.)  In places, the petition to the California Supreme Court has more detail than the instant petition, and so the Court looks to that petition for additional clarity as to Petitioner's positions where necessary or helpful.

3

new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable." *Hernandez v. Small*, 282 F.3d 1132, 1142 (9th Cir. 2002). These provisions "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S. 1, 10 (2007).

## III. ANALYSIS

When the California Supreme Court denies a petition for review without comment, as happened to Petitioner's claim for prosecutorial misconduct, this Court is required to "look through" that denial to the next reasoned state court opinion. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991). Here, it is the California Court of Appeal opinion. On the other hand, when the California Supreme Court denies a habeas petition without opinion and there is no other reasoned state court opinion to review—as is the case with the remainder of Petitioner's arguments,—the Court must "perform an independent review of the record to ascertain whether the state court decision was objectively reasonable." *Haney v. Adams*, 641 F.3d 1168, 1171 (9th Cir. 2011) (quotation marks omitted). "That is not a *de novo* review of the constitutional issue, but only a means to determine whether the state court decision is objectively reasonable." *Id.* (quotation marks omitted). The burden remains with the petitioner to "show that there was no reasonable basis for the state court's ruling" and this Court must "determine what arguments or theories could have supported the state court's decision" and then "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court." *Id.* (alterations and quotation marks omitted).

### A. Confrontation Clause

The Confrontation Clause protects the right of the accused "to be confronted with the witnesses against him." U.S. Const. amend. VI. It has been interpreted to generally bar the use of testimonial, out-of-court statements offered for the truth of the matter asserted. *See Crawford v. Washington*, 541 U.S. 36, 51 (2004). In determining whether

4

an out-of-court statement is testimonial, the Court is required to ask "whether a statement was given with the primary purpose of creating an out-of-court substitute for trial testimony." *Ohio v. Clark*, 135 S. Ct. 2173, 2183 (2015) (quotation marks omitted). Petitioner argues the Confrontation Clause was violated when the police officers testified about his gang ties. (ECF No. 26-1, at 12.)

### 1. Expert Testimony

Petitioner first argues that the prosecution's gang expert's testimony violated the Confrontation Clause because his opinion that Petitioner was involved in the Lomitas gang was based, in part, on reports from other officers and individuals. However, an expert may rely on "inadmissible testimonial hearsay," to form an opinion, and may—subject to certain exceptions not raised here—disclose to the jury the evidence he relied on "in forming his opinion." *United States v. Vera*, 770 F.3d 1232, 1237 (9th Cir. 2014). Thus, "there is generally no *Crawford* problem when an expert applies his training and experience to the sources before him and reaches an independent judgment." *Id.* (alterations and quotation marks omitted). "But an expert exceeds the bounds of permissible expert testimony and violates a defendant's Confrontation Clause rights when he is used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation." *Id.* (quotation marks omitted). "Accordingly, the key question for determining whether an expert has complied with *Crawford* is the same as for evaluating expert opinion generally: whether the expert has developed his opinion by applying his extensive experience and a reliable methodology." *Id.* at 1237–38 (quotation marks omitted).

The Ninth Circuit in *Vera* provided a useful synopsis of how that standard works in the gang-expert context. The Court noted a previous case where the Second Circuit found the admission of a gang expert's testimony violated the Confrontation Clause. There, an agent "communicated out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of an expert opinion." *Id.* at 1238 (quoting *United States v. Meija*, 545 F.3d 179 (2d Cir. 2008)). In fact, "the agent's drug

tax testimony was based directly on the statements made by [a gang] member in custody." *Id.* (citation omitted).  Because the agent directly repeated testimonial hearsay, the legitimacy of his testimony was questioned, and the court began to suspect "he had merely summarized an investigation conducted by others, rather than applying his expertise to draw his own conclusions." *Id.*

In contrast, the agent in *Vera* "review[ed] intercepted telephone calls," noted that the relevant geographic region "fell within the territory of the . . . gang," and then used his own knowledge of "gang practices to deduce the significance of that information" to render his opinion.  *Id.* at 1238–39.  The agent in *Vera* "was not merely repackag[ing] testimonial hearsay" but instead was creating "an original product that could have been tested through cross-examination."  *Id.* at 1239 (quotation marks omitted).  Therefore, the agent did not violate the Confrontation Clause.

Similar to the expert in *Vera*, Sherman, the state's gang expert in this case, provided testimony that did not violate the Confrontation Clause.  Sherman testified that he based his opinion that Petitioner was a Lomitas member on a number of disparate pieces of information, including reports from other officers (*see* ECF No. 27-28, at 90–91), and other pieces of evidence such as: Petitioner's moniker "Villen" appeared on gang rosters (ECF No. 27-27, at 181); Petitioner was married to a Lomitas gang member's sister (*id.*); Petitioner appeared in many photographs with other Lomitas gang members, including some in gang territory or with members sporting tattoos declaring allegiance to the Lomitas (*id.* at 213–14, 218, 221, 234–35; ECF No. 27-28, at 29–30, 40, 56); Petitioner appeared to be making a Lomitas gang sign in one photograph (ECF No. 27-27, at 224–25); he was named in a list of other gang members recovered from his home (*id.* at 229–30); he had photographs of graffiti and "tags" related to the Lomitas gang at his home (ECF No. 27-28, at 42–45); his camera had a picture of him between two trees, one marked "LV" and the other "70" (*id.* at 46); letters sent from Lomitas gang members to Petitioner in jail in code (*id.* at 47–51); Petitioner's phone number was found in the cell phone contacts of three known gang members as "M," "Mike," and "Vill" (*id.* at 109); and Petitioner's cell

6

phone had "7-0" set as its screensaver (*id.* at 118).[3]  Thus, as in *Vera*, Sherman did much more than simply repackage the contents of other officers' reports; he drew information from a large number of disparate sources and used his experience and expertise to form his opinion.  Because Sherman "applied his training and experience to the sources before him and reached an independent judgment, his testimony complied with *Crawford* and the Confrontation Clause."  *See Vera*, 770 F.3d at 1239–40 (alterations and quotation marks omitted).

## 2.    Non-Expert Officers

As proof that Petitioner was a member of the Lomitas, the State offered lay testimony from seven officers who had encounters with Petitioner.  (*See generally* ECF No. 27-27, at 110–64.)  The crux of the officers' testimony was that Petitioner encountered law enforcement either in territory later defined as Lomitas territory or while accompanied by individuals that would later be shown to be Lomitas members by the State's expert.  Three of the officers—Gray, Rodriguez, and Lujan—restricted their testimony to the facts of the encounters with Petitioner and did not include opinions of his or his companions' gang-member status.  (*See* ECF No. 27-27, at 136–41; 149–58; 159–64.)  But the other four officers testified that Petitioner, or someone he was with at the time of the encounter, was a known Lomitas member based on "record checks" or "prior information."  (*See* ECF No. 27-27, at 119 (Officer Black relying on a records check to determine an individual encountered with Petitioner was a Lomitas); 135–36 (same for Officer Irwin); 144 (Officer Choi relying on unidentified "prior information" to determine two individuals with Petitioner were Lomitas); 148–49 (Officer Rozsa testifying that "somebody else" told him that Petitioner and two others he was with were Lomitas).)  Petitioner argues that this testimony violated the Confrontation Clause because those officers, who were not qualified as experts, provided testimonial hearsay that he or his companions were Lomitas.  (*See*

---

[3] This list is exemplary, not exhaustive.  Detective Sherman discussed additional pieces of evidence in his extensive testimony.  (*See generally* ECF No. 27-27, at 165–95, 204–47; ECF No. 27-28, at 29–127.)

ECF No. 32, at 11.)  But even accepting Petitioner's premise that this testimony comprised testimonial hearsay in violation of the Confrontation Clause, there is still no basis to issue the writ because any error resulting from admittance of a few lines of officer testimony did not have "a substantial and injurious effect or influence in determining the jury's verdict." *Merolillo v. Yates*, 663 F.3d 444, 454 (9th Cir. 2011) (quotation marks omitted).

First, the officers' testimony is duplicative of Sherman's expert testimony concerning Petitioner's status: officers mentioned Petitioner's association with known Lomitas members and had encountered law enforcement several times in the Lomitas' territory.  And, as the Court found above, Sherman's expert testimony did not violate the Confrontation Clause.  Thus, regardless, the jury appropriately heard the potentially objectionable testimony from another source.  *See Merolillo*, 663 F.3d at 455 (noting the court is required to consider "whether the testimony was cumulative" in determining harmlessness in potential Confrontation Clause violations).

Second, any error in admitting that testimony would be harmless even if it were not duplicative, because the objected-to evidence comprised a matter of a few lines in thousands of pages of transcript.  And the evidence of Petitioner's gang membership was simply overwhelming.  *See id.* (setting out that the "overall strength of the prosecution's case" must be considered in Confrontation Clause harmless-error analysis).  The large amount of physical and documentary evidence supporting Petitioner's membership in the Lomitas, in addition to Sherman's opinion, Hiday's testimony, and similar testimony from Larry Vargas, who grew up with Petitioner, leads this Court to conclude that any Confrontation Clause problem in admitting those few lines of officers' testimony did not have a "substantial and injurious effect or influence" on the jury's conclusion that Petitioner was a Lomitas gang member.  *Id.*

## B. *Miranda* Violations

Prior to questioning a suspect in custody, police are required to inform him "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or

8

appointed." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). If this warning is not given, any response or statement by the suspect cannot be used as evidence of his guilt. *Berkemer v. McCarty*, 468 U.S. 420, 429 (1984). Petitioner argues that Sherman and the seven officers who provided testimony regarding Petitioner's law enforcement contacts each violated *Miranda*.

The problem with this claim is that Petitioner can only recall one instance in which a statement he made to any of those officers was repeated to the jury by the officer. In his argument, which is conflated with his Confrontation Clause argument,[4] Petitioner claims that Officer Gray had "personal contact with Petitioner" and testified that Petitioner stated that he "[hung] around with LV gang members." (*See* ECF No. 1, at 62.) It does not appear that Petitioner was in custody at the time this statement was made. (*See id.* at 61 (stating Petitioner was pulled over by Officer Gray for a DUI check).) Furthermore, having reviewed the other officers' testimony, the Court has not located any other statements made by Petitioner while he was in custody. Accordingly, this claim fails because there is no basis in the record to support Petitioner's contention that a statement was taken from him while in custody, without being read his *Miranda* rights, and that such a statement was introduced into evidence.

## C.    Ineffective Assistance of Counsel

To make out a claim for the ineffective assistance of counsel, a petitioner must establish that counsel had an unreasonably deficient performance and prejudice occurred as a result of that performance. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). Counsel's performance is considered deficient if it falls below an objective standard of reasonableness under prevailing professional norms. *Id.* at 689. A petitioner has been

---

[4] Similarly conflated in the same argument sections is Petitioner's claim that the officers lacked "personal knowledge" to testify to his gang membership. (*See, e.g.*, ECF No. 32, at 13–18.) But personal knowledge is a concept in California evidentiary law, not constitutional law, and challenges to state evidentiary admissibility are not cognizable in a § 2254 habeas corpus petition. *See Grajeda v. Scribner*, No. CV 09-7280-PSG(CW), 2011 WL 4802564, at *17 (C.D. Cal. Aug. 1, 2011).

prejudiced by his counsel's performance when "there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceedings would have been different." *Id*. at 694.

### 1. Trial Counsel

Petitioner claims his trial counsel was ineffective because counsel failed to impeach Hiday's credibility as a witness, object to testimonial hearsay and *Miranda* violations by officers, object to "gun-evidence," object to or request to clarify jury instructions, and that the cumulative impact of these deficiencies resulted in prejudice. (ECF No. 1, at 9–10.)

#### a. Failure to Impeach or Challenge Hiday

The prosecution's primary witness linking Petitioner to Balderas's murder was former Lomita Village gang member Elizabeth Hiday. Petitioner claims his trial counsel was ineffective because counsel did not impeach Hiday with her prior statement to police and her preliminary hearing testimony. (*See* ECF No. 1, at 65.) Moreover, Petitioner argues his counsel failed to object to Hiday's impermissible lay opinion testimony of the meaning of the statements Petitioner made to her. (*See id.* at 66.)

In fact, the most remarkable thing about Hiday's recorded statement and preliminary hearing testimony is how consistent they were with her trial testimony. The critical part of her trial testimony was:

> [Petitioner] said that they were – had went back there on Halloween and that they had a scream mask so that they wouldn't be able to be recognized. Him and two other guys had went to Victor's house to go get Victor. Victor ran in the house, and Junior was in front of the residence with two little girls, and they got – he got into a fight with Junior. And that Junior was blocking them from getting into the residence and that two gunshots went off. And Junior was still fighting him, and then two more gunshots went off. And then he dropped and then they took off running.

(ECF No. 27-28, at 142.) At trial, she also testified that "when [Petitioner] was telling the story, he was talking, he was the one that was telling the story and referring to him as being at the murder and being the one who actually killed Junior." (ECF No. 27-28, at 169.) Her preliminary hearing testimony was, in pertinent part:

10

[Petitioner] said that him and two other guys went to Junior's house and – because they were going to go get Victor. When they got there, Junior was in front of the house with, I think, two little kids, and it got into a fight. Junior was blocking him from going into the house to get Victor, and then two shots went off and he said Junior was still fighting. And two more shots went off and he dropped and they took off running.

(ECF No. 27-38, at 153.) She later confirmed they used a "Scream mask" (*id.* at 154) during the attack and that although Petitioner never directly said who the shooter was, "he was talking as if he was the one who did it" (*id.* at 159). Finally, in the initial interview, given just over a week after the murder and years before her trial testimony, she stated:

And they went over to, um, Junior's house. And they got – no, Junior was out front and I guess they – what they – what [Petitioner] and them were trying to do was go into the house. But Junior was fighting them off and going into the house because he knew his little brother Victor was in the house. So he starts fighting 'em and I guess that's when the g- two gunshots went off [Petitioner] said, and then I guess, I don't know, two more went off he said, something like that. But anyways when they seen Junior drop they took off running.

(ECF No. 27-5, at 100.) In response to questions regarding the identity of the shooter, she answered "[Petitioner] said he did." (*Id.* at 102.) In the same interview, she later indicated that Petitioner "said they were wearing Scream masks." (*Id.* at 108.)

Petitioner argues Hiday's statement in her trial testimony that Petitioner was "the one who actually killed Junior," contrasted with her preliminary hearing testimony that he never said who did the killing. (*See* ECF No. 32, at 21.) It appears that Petitioner is arguing his counsel should have confronted Hiday with these allegedly disparate statements to determine the exact language Petitioner used when telling the story in an effort to discount Hiday's testimony.

The decision not to pursue that line of questioning, or any line of questioning about the exact wording comparing these three statements, was not deficient performance because it was not objectively unreasonable. Had counsel brought the jury's attention to the preliminary hearing testimony and the original statement by nit-picking the specific words of these statements, it could have reinforced Hiday's testimony rather than

11

undermine it. Considering there was a time gap between each statement, and the fact that the overarching story and many of the minute details remained entirely consistent between all three, Petitioner's counsel would certainly have feared drawing the jury's attention to Hiday's past statements and opening the door for the government to delve into the statement's similarities. *See Pimental v. Montgomery*, No. 16-cv-2212-LAB (DHB), 2017 WL 5999095, at *6 (S.D. Cal. Dec. 4, 2017) ("Petitioner's ineffective assistance of counsel claim based on his trial counsel's failure to properly impeach Betty Edwards fails as Edwards' testimony at trial was consistent with her statement to Officer Villagran."). The Court is required to indulge "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and Petitioner has not shown that counsel's actions in this regard might be considered something other than "sound trial strategy." *Strickland*, 466 U.S. at 689.

Separately, Petitioner argues that counsel was ineffective for failing to challenge the admission of Hiday's lay opinion testimony that "when [Petitioner] was telling the story, he was talking, he was the one that was telling the story and referring to him as being at the murder and being the one who actually killed Junior." (ECF No. 27-28, at 169.) Petitioner argues that it was deficient to allow Hiday to "opine[] that Petitioner was the actual shooter, based on her impression of how the conversation happened." (ECF No. 1, at 66.) Initially, the Court is not convinced that Hiday is giving lay opinion testimony here; instead she seems to be testifying that Petitioner told her he was "the one who actually killed Junior." (*Id.*)

However, even if her testimony can be read the way Petitioner claims, his argument still fails. California law permits lay opinion testimony if that testimony is "[r]ationally based on the perception of the witness; and [h]elpful to a clear understanding of his testimony." Cal. Evid. Code § 800 (section numbers omitted). Here, presuming Hiday's testimony is lay opinion testimony, it would fit the requirements of § 800 for admission. *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) ("[T]rial counsel cannot have been deficient for failing to raise a meritless claim."). Moreover, had Petitioner's counsel

12

objected to this point, Hiday may have been prompted to lay additional foundational testimony, including going into greater detail for the *reasons* for her belief that Petitioner was the shooter based on his demeanor and actions. Counsel may have rationally feared that more detail would make Hiday seem more credible and thus reasonably forewent that objection. *See Navarette v. Lewis*, No. CV 12-4268-GHK (MAN), 2015 WL 769776, at *18 (C.D. Cal. Feb. 23, 2015) (finding California law allows lay opinion testimony if the opinion is rationally based on the witness's perceptions and that it was reasonable for counsel not to object if he feared the objection could lead the prosecutor to lay a foundation that could be more damaging to the petitioner's defense (citation omitted)). Thus, Petitioner has not met his burden to show that his counsel was deficient for failing to object to this testimony.

### b. Failure to object to Confrontation Clause or *Miranda* violations

Second, Petitioner argues that his trial counsel was ineffective for failing to raise the Confrontation Clause and *Miranda* arguments already rejected above. But since counsel is not defective for "failing to raise a meritless claim," this argument fails for the same reason the arguments failed *supra* at Sections III.A and B. *See Juan H.*, 408 F.3d at 1273.

### c. Failure to object to the gun evidence or seek a limiting instruction

Third, Petitioner claims that his counsel should have objected to the admitted evidence of Petitioner's prior arrest for illegal possession of a firearm and a knife at a DUI checkpoint, or that counsel should have submitted a contemporaneous special jury instruction further clarifying the scope and meaning of this evidence. (ECF No. 1, at 9.)

The Court need not address whether the failure to object to the evidence, or seek a limiting instruction, was deficient performance, because even presuming it was, Petitioner failed to show prejudice. The testimony in question was mentioned in Officer Gray's testimony and again in a stipulation entered into by the parties that the gun recovered in that incident was not the murder weapon. (*See* ECF No. 27-27, at 160–61; ECF No. 27-

13

29, at 107.) In total, the Court was able to locate mention of this incident on three pages of a several thousand page transcript. It does not appear in the prosecutor's closing arguments, despite a lengthy recitation of the gang evidence. (*See generally* ECF No. 27-30, at 137–94, 257–87.) And although counsel failed to request a contemporaneous limiting instruction, the Court gave the following instruction concerning gang evidence as a whole in its final jury instructions:

> You may consider evidence of gang activity only for the limited purpose of deciding whether the defendant acted with the intent, purpose and knowledge that are required to prove the gang-related crime and enhancements charged or the defendant had a motive to commit the crime charged. You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and the information relied on by an expert witness in reaching his or her opinion. You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime.

(ECF No. 27-30, at 130 (formatting omitted).) *See also Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions."). Indeed, the prosecutor himself said during closing: "The gang evidence is not to be used to say: they're bad guys. Therefore they're guilty. It has specific purposes that you're supposed to use it for." (ECF No. 27-30, at 142.) He then referred the jurors back to the permissible purposes of gang evidence from the instruction above. Accordingly, given the lack of focus on the evidence of possession and the above instructions, the Court concludes that Petitioner has not met his burden to show that there is a reasonable probability that the outcome of the trial would have been altered had his counsel objected to the evidence or requested a contemporaneous limiting instruction on its use.

### d. Failure to object to or clarify jury instructions

Fourth, Petitioner claims his trial counsel was ineffective because counsel did not object to or request to clarify two model California jury instructions, CALCRIM 358 and 359. (ECF No. 1, at 9–10.) The first instruction given to the jury—CALCRIM 358—was:

14

You have heard evidence that the defendant made oral or written statements before the trial. You must decide whether the defendant made any of these statements in whole or in part.

If you decide that the defendant made such statements, consider the statements along with all the other evidence in reaching your verdict.

It is up to [sic] decide how much importance to give to the statements. Consider with caution any statement made by the defendant tending to show his guilt unless the statement was written or otherwise recorded.

(ECF No. 27-30, at 119–20.) Petitioner argues this instruction was insufficient because (1) the second sentence did include the phrase "whether or not" to clearly indicate to the jury they could reject the statement and (2) it was insufficiently protective given the cautionary language of *People v. Diaz*, 345 P.3d 62, 66–67 (Cal. 2015) concerning extrajudicial party admissions. The first argument is unfounded; the very next sentence of the instruction indicates that only if a jury "decide[s] that the defendant made such statements" may they "consider the statements along with all the other evidence in reaching your verdict." Thus, the instruction already clearly encapsulates the concept that the jury may reject that the defendant made the statement and refuse to consider it.

Petitioner's second argument is similarly misplaced. In *Diaz*, although recognizing that extrajudicial admissions are inherently problematic, the California Supreme Court actually reversed its previous holding that CALCRIM 358 had to be given in every case involving such an admission. *See* 345 F.3d at 70–71. Instead, the court need only give the instructions in circumstances where it would be helpful for the jury. *Id.* at 72 ("[T]he cautionary instruction concerning the defendant's extrajudicial statements may be helpful in some circumstances but is not vital to the jury's ability to analyze the evidence." (quotation marks omitted)). *Diaz* cannot be read to support the proposition that the model instruction is somehow deficient on this point—particularly since it instructs the jury to "[c]onsider with caution" any unwritten statement, like the one in this case—or that it is deficient performance for counsel to fail to demand an even stronger protective instruction than the one already provided.

15

The second instruction Petitioner claims his counsel failed to object to or modify—which was given immediately after the instruction set out above—was:

> A defendant may not be convicted of any crime based on his out-of-court statements alone.
>
> You may only rely on the defendant's out-of-court statements to convict him if you conclude that other evidence shows that the charged crime was committed. That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed.
>
> The identity of the person who committed the crime may be proved by the defendant's statements alone.
>
> You may not convict the defendant unless the people have proved his guilt beyond a reasonable doubt.

(ECF No. 27-30, at 120.) Petitioner complains argues that the fourth sentence is unfair and permits him to be identified "on the basis of his extrajudicial statements alone" and therefore convicted on that basis alone. (ECF No. 1, at 72; ECF No. 32, at 25.) However, California law permits identification based on a defendant's out-of-court statement alone—and Petitioner has not identified any constitutional impediment to California law allowing as much—so any objection from his counsel to that portion of the instruction would have been meritless. *See People v. Valencia*, 180 P.3d 351, 377 (Cal. 2008) ("The identity of the defendant as the perpetrator is not part of the corpus delicti; identity may be established by the defendant's words alone."). And the instruction as given was clear that such a statement is *not* enough to convict unless "other evidence shows that the charged crime was committed." Therefore, contrary to Petitioner's claim, the instruction does not suggest that a conviction based on that evidence alone would be permissible and counsel was not ineffective for failing to press meritless claims. *See Juan H.*, 408 F.3d at 1273.

### e.    Cumulative Impact

For the above reasons, there are not multiple instances of deficient performance and therefore no evidence of cumulative prejudice. *See Harris v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995) ("[P]rejudice may result from the cumulative impact of multiple deficiencies."). This ground is not a basis for issuing the writ.

16

## 2. Appellate Counsel

Next, Petitioner complains that his appellate counsel was ineffective for failing to raise each of the previously addressed issues on direct appeal. The Court reviews claims of appellate counsel ineffectiveness "according to the standard set out in *Strickland*." *Cockett v. Ray*, 333 F.3d 938, 944 (9th Cir. 2003). In other words, Petitioner must still show that appellate counsel's "performance fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, [he] would have prevailed on appeal." *Id.* (citation and quotation marks omitted).

Petitioner does not explain how raising these issues on direct appeal would have led to different results. Each of the issues was raised in his habeas corpus petition to the California Supreme Court, which was rejected without opinion. This Court must treat such a rejection as on the merits—i.e. the California Supreme Court considered and denied each claim. *See Haney*, 641 F.3d at 1170 n.3. It is unclear what possible prejudice there could have been, because there is no reason to suspect the California Supreme Court would have acted differently had the issues been raised on direct appeal rather than collateral attack. *See Yong Bae Hong v. Santoro*, No. 8:16-cv-00904-AG (SK), 2018 WL 1665183, at *5 (C.D. Cal. Feb. 28, 2018) (holding a petitioner cannot establish prejudice because "there is no likelihood that the California appellate courts—having rejected Petitioner's underlying arguments on collateral review—would have arrived at a different result if those same arguments had only been raised sooner on direct appeal before the very same courts" (citation omitted)) *report & recommendation adopted*, 2018 WL 1641236 (C.D. Cal. Mar. 31, 2018).

## D. Prosecutorial Misconduct

Petitioner claims that during closing arguments, the prosecutor equated the reasonable doubt standard to everyday decision making, therefore trivializing the decision enough to render the entire trial unfair under the Fourteenth Amendment. (ECF No. 1, at

17

11.) In its opinion, the California Court of Appeal, provided a useful synopsis of the complained-of closing arguments:

> During closing argument, the prosecution discussed reasonable doubt. He did so while showing the jury an exhibit containing the text of CALCRIM No. 220: "Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt . . . because everything in life is open to some possible or imaginary doubt."
>
> In discussing reasonable doubt, the prosecutor said:
>
> "What is reasonable doubt? Well, it's an abiding conviction. The law is—defines it in this way. Says if it leaves you with an abiding conviction that the charge is true—it doesn't need to eliminate all possible doubt, cause everything in life is open to possible doubt.
>
> "Your job is not to go back and start speculating or guessing or thinking about possibilities. It's to use your common sense, use all the evidence that's presented and come to a conclusion that leaves you with that abiding conviction.
>
> "That is the way I describe it. At some point after you've convicted Grims and Villen of this crime, you're going to go back to your lives. People are going to ask you: You were on jury service. You were on jury duty. What was that case about?
>
> "You're going to tell them it was a murder. It was a gang murder. It was a retaliation murder.
>
> "It's when you're talking to them about everything that you witnessed in this case that you're still going to have the abiding conviction deep inside you. You're going to tell them about all the evidence that you heard.
>
> "They're going to say: Well what was the case about? You tell them it was a gang retaliation killing. A family had been confronted by a gang member in front of their house . . . What happened? Talk to them about the 911 call, about the witnesses who came in, testified about Grims banging Lomita. . . . Tell them about this violent criminal street gang . . . Tell them about

18

16-cv-2421-BAS-AGS

the 911 call that captured it all, that you had no doubt as to what happened on October 21. Tell them about the DNA that was on the gun, about how Grims lied about even having that gun. And tell them how Vidal Balderas, the guy who was chastising Grims . . . . how you could hear his voice . . . on that 911 call.

"They're going to say: Well, what happened? Tell them ten days later the defendants came back and they murdered him. They're going to ask why. Explain to them all the gang evidence . . . Talk about the fact that . . . all the witnesses . . . described basically three men in this group: Skeleton, Scream, and Bandanna. They found the skeleton mask inside Grims' house that had his DNA on it. He couldn't buy his way out of that one. Talk to them about how he said he was home from 1:30 on, but we didn't believe a word that he said because his brother, he came in and actually told us the truth; said that he got home right after the murder, went to his room, changes his clothes, took a shower.

"Talk about the poofy jacket, the black jeans that had the Mikey note inside of them, each with Grims' DNA on it.

"Talk about the calculator that was the lineup and that the person who was out of custody . . . admitted going and doing the shooting with two of his homies. Talk about why you believe Elizabeth Hiday, why you knew that she didn't have a motive to lie. As you're telling this story to the person, you're still going to feel that abiding conviction because you're going to know that it's the truth. That's what beyond a reasonable doubt is."

. . . .

In his rebuttal closing argument, the prosecutor reiterated:

"You will have that abiding conviction when you're telling your neighbor, your sister, your brother, your mother, whoever it is, your employer who hasn't seen you in a month exactly why you held them accountable, exactly why you found them guilty of first degree murder."

19

(ECF No. 1, at 29–31 (formatting omitted).)   In rejecting Petitioner's prosecutorial misconduct challenge, the California Court of Appeal first reviewed several state cases and then summarized:

> In each of the cases relied upon by Appellants, the examples of everyday decisions made by jurors were expressly and unambiguously used to expound upon the reasonable doubt standard. By contrast, the prosecutor in the instant matter did not reference any every day decision a juror would make. The comments appear to be directed not at the burden of proof, but strength of the evidence. In fact, it appears the prosecution was arguing that the evidence of guilt was so convincing that the jurors would remain convinced over time. This definition of an abiding conviction is consistent with how our high court defined [guilt beyond a reasonable doubt].

(*Id.* at 34.)

Petitioner argues, as he did to the state court, that the prosecutor "essentially equated reasonable doubt to everyday decision making on things like marriage, changing lanes or getting out of bed; talking about the case with the neighbors." (ECF No. 1, at 11.)   When reviewing a claim for prosecutorial misconduct, "[t]he relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).

The Court is not persuaded by Petitioner's construction of the prosecutor's closing argument.   As the California Court of Appeal noted, it does not appear that the prosecutor equated the beyond-a-reasonable-doubt burden with everyday decision making, because everyday decision making was not mentioned.   Instead, the closing argument focused on how the jurors should be so convinced by the state's case that they would have a permanent certainty that the defendant committed the crime.   Therefore, the Court denies the request for the writ because the premise of Petitioner's argument is simply a flawed interpretation of the prosecutor's argument.

Even if Petitioner correctly interpreted the prosecutor's argument, Petitioner has not met his burden to show that the California Court of Appeal's decision was contrary to or an unreasonable application of clearly established federal law.   Petitioner has not pointed to a Supreme Court holding which, either directly or by implication, condemns this kind

of closing argument as in tension with the Due Process Clause. *See Deck v. Jenkins*, 814 F.3d 954, 978 (9th Cir. 2014) (en banc) ("[C]learly established federal law" includes only "the holdings . . . of Supreme Court decisions" (alteration and quotation marks omitted)). Although some California state court opinions have suggested that this kind of closing argument is inappropriate, neither California opinions nor even the opinions of this Court or the Ninth Circuit are sufficient to "clearly establish" federal law for these purposes. *See Parker v. Matthews*, 567 U.S. 37, 48 (2012) (holding that, in the prosecutorial misconduct context, the Sixth Circuit "erred by consulting its own precedents, rather than those of [the Supreme] Court, in assessing the reasonableness of the Kentucky Supreme Court decision.").

Critically, though, even if Petitioner's construction of the argument was correct and he had met his burden to show that the California Court of Appeal's opinion was in tension with clearly established federal law, he fails to show prejudice. The prosecutor showed the jurors the appropriate definition of beyond a reasonable doubt. The jurors were also instructed in the definition of beyond a reasonable doubt by the trial judge, which a jury is presumed to follow. *See Weeks*, 528 U.S. at 234. And "arguments of counsel generally carry less weight with a jury than do instructions from the court." *Boyde v. California*, 494 U.S. 370, 384 (1990). Finally, the jury instructions explicitly told the jurors that if they "believe[d] that the attorneys' comments on the law conflict with [the] instructions, you must follow [the] instructions." (ECF No. 27-30, at 107.) In light of these facts, Petitioner has failed to show that the prosecution's argument, even if it can fairly be characterized in the way he claims, "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181; *see also Horton v. McWean*, No. CV 10-6428-JFW (JEM), 2012 WL 6110488, at *23 (C.D. Cal. Nov. 5, 2012) (finding the petitioner had not established prejudice when prosecutor compared the beyond-a-reasonable-doubt standard to walking across the street or stopping at a red light) *report & recommendation adopted*, 2012 WL 6131200 (C.D. Cal. Dec. 10, 2012).

/ / /

# CONCLUSION

Petitioner's arguments are without merit. Accordingly, his petition for a writ of habeas corpus is **DENIED**. Rule 11 of the Rules Governing Section 2254 Cases states that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A certificate of appealability should issue as to those claims on which a petitioner makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Neither is the case here, and so the Court declines to issue the certificate of appealability. The Clerk is directed to close this case.

**IT IS SO ORDERED**.

**DATED: November 20, 2018**

Hon. Cynthia Bashant
United States District Judge

16-cv-2421-BAS-AGS